2021 IL App (1st) 200536-U

THIRD DIVISION
December 22, 2021

No. 1-20-0536

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| MONARCH HOSPICE & PALLIATIVE CARE, INC., d/b/a HERITAGE HEALTHCARE, STEPHEN M. MASTERS, JR., ELLIOTT LATINIK, LEAH MIRANDA, MOISHE GUBIN, and MICHAEL BLISKO, all Individually, | ) ) ) ) ) | Appeal from the Circuit Court Cook County. |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No. 17 L 002957 |
| YOLANDA YBARRA and RUBEN YBARRA, | ) ) ) | |
| Defendants. | ) | |
| YOLANDA YBARRA, | ) ) | |
| Counter-Plaintiff/Appellant-Cross-Appellee, | ) ) | |
| v. | ) ) | |
| MONARCH HOSPICE & PALLIATIVE CARE, INC., d/b/a HERITAGE HEALTHCARE, STEPHEN M. MASTERS, JR., ELLIOTT LATINIK, LEAH MIRANDA, MOISHE GUBIN, and MICHAEL BLISKO, all Individually, | ) ) ) ) ) ) | Honorable Margaret Ann Brennan, |
| Counter-Defendants/Appellees-Cross-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Gordon and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:    (1) The trial court properly allowed Ybarra to file an amended counterclaim; (2) the judgment against Monarch was proper where Monarch had been a party from the start of the action; (3) plaintiffs' claims on the breach of contract claim lack merit; (4) attorney fees for the breach of contract claim were improper and are vacated; and (5) the trial court's denial of damages for accounts receivable was not against the manifest weight of the evidence.

¶ 2    This appeal arises from sale of the common capital stock in plaintiff Monarch Hospice & Palliative Care, Inc., (Monarch) from defendant Yolanda Ybarra to plaintiffs Stephen M. Masters, Jr., Elliott Latinik, and Leah Miranda (collectively Purchasers).[1] Monarch is a Medicare certified and licensed hospice provider for terminally ill patients. Following a bench trial, the trial court entered judgment in favor of Ybarra on plaintiffs' breach of contract claim. The court also entered judgment in favor of Ybarra on her amended counterclaims of breach of contract and action on a promissory note and awarded Ybarra the principal amount due from the Monarch sale with interest, plus attorney fees and costs.

¶ 3    Ybarra appeals, arguing that the trial court erred by denying her request to award $239,462.70 she claimed was due her for the account receivables accrued prior to the sale of Monarch.

¶ 4    Plaintiffs filed a cross-appeal, raising multiple issues related to the judgment on Ybarra's amended counterclaim, arguing that the trial court erred in: (1) allowing Ybarra to file an amended complaint after the close of proofs; (2) entering judgment against Monarch without notice and an

---

[1] Plaintiffs Moishe Gubin and Michael Blisko were dismissed with prejudice from the action in the trial court's judgment order on October 7, 2019, and are not parties to the appeal.

opportunity to be heard; (3) entering judgment against the Purchasers for the new breach of contract claims; (4) awarding attorney fees on the breach of contract claim in the absence of a contractual provision for such an award; and (5) ignoring admitted evidence of a set-off claim. Plaintiffs have not appealed the trial court's judgment in favor of Ybarra on their complaint.

¶ 5     Ybarra and the Purchasers entered into a stock purchase and settlement agreement (SPA), dated December 31, 2013, for the sale of all outstanding shares in Monarch from Ybarra to the Purchasers for $750,000. Under section 1.2(e), the Purchasers agreed to pay $50,000 to Ybarra upon the execution of the SPA with an additional $100,000 paid at closing and held in escrow until the delivery date. The remainder of the purchase price, $600,000, was financed by Ybarra and scheduled to be paid as follows: $100,000 to be paid on or before 90 days after the delivery date and $500,000 on or before the two year anniversary date with interest of 5% per annum. The closing date was scheduled for December 31, 2013.

¶ 6     Also, under section 1.2(e) the SPA, Ybarra acknowledged that she was representing the financial condition of Monarch to the Purchasers, and in the event that she failed to disclose a liability that existed prior to the closing, then the Purchasers "may reduce the amounts due under the Note in an amount equal to the undisclosed liability." The SPA further provided in section 1.2(e)(iii):

> "The parties agree on or around March 31, 2014 (the "Accounting Date") to review all accounts payable and accounts receivable of the Company related or attributed to the period prior to Closing, but incurred or received during the period starting with the Closing and ending with the Accounting Date (the "Accounting Period"). The parties shall agree on a method to calculate whether: (1) the relevant accounts receivable exceeded the relevant accounts payable, with any excess amount then

paid to Seller; or (2) the relevant accounts payable exceeded the relevant accounts receivable, with the amount of any deficiency deducted from the balance of the Note. The parties agree to cooperate with one another as reasonably necessary to make the determinations set forth in this subsection."

¶ 7    Monarch's assets and liabilities were attached to the SPA as follows: accounts receivable in Schedule 2.14(a); accounts payable in Schedule 2.14(b); and all banks, bank accounts, and other financial institutions in Schedule 2.14(c).

¶ 8    A secured promissory note for the balance of $600,000 was also executed on December 13, 2013, between the Purchasers and Ybarra. The note provided that the principal sum "may be reduced pursuant to the provisions of Section 1.2" of the SPA.

¶ 9    In January 2014, Monarch received a letter from Palmetto GBA (Palmetto) regarding a review of Monarch's inpatient day limitation and hospice cap amount for Medicare. As a result of the review, Monarch was required to pay $130,428 to Medicare for exceeding the hospice cap amount for the year running from November 1, 2011 to October 31, 2012.

¶ 10    Following the Palmetto letter notifying of the required payment, Ybarra and the Purchasers entered into an amended SPA (Amended SPA), effective May 31, 2014, in which the parties modified the SPA and promissory note. The Amended SPA changed the financing terms under section 1.2(e): $100,000 to be paid on or before December 13, 2105, with 5% interest per year, and $370,000 on or before the two year anniversary of the delivery date, with 5% interest per year.

¶ 11    Section 1.2(e)(ii) further stated:

"The parties agree that any future CAP issues, other than 'clawback'[2] claims of Medicare or other third party providers arising before December 31, 2012 (i.e., the pre-2012 Medicare clawback claims reduced the sums due under the Secured Promissory Note to the $370,000 principal sum due under the Modified Note), which arise after the Effective Date will be reduced from the loan balance of $370,000 and not from other amounts owed by Purchasers to Seller under this Agreement or which otherwise are the property of Seller pursuant to this Agreement."

¶ 12    The Amended SPA also modified section 1.2(e)(iii) related to account receivables due to Ybarra, which now included the additional language that the Purchasers "shall pay to [Ybarra] all accounts receivable of [Monarch] which relate to the period prior to Closing (the 'Old A/R') on the 15th and 30th of every month." Section 2.14(b) included an indemnification from Ybarra to the Purchasers for any claims made against Monarch for accounts payable or invoices that arose prior to closing until December 31, 2015. The Amended SPA also included the following provision:

"In all other respects, the Agreement and the Pledge Agreements are ratified and approved, and the security interest of Seller in the Stock of the Purchasers will

---

[2] A "clawback" is defined as "the recovery of previously dispensed or protected money or benefits through a contractual provision or tax law, typically triggered to counter a shortfall in financial performance or offset a liability." Dictionary.com, https://www.dictionary.com/browse/clawback, last accessed on Nov. 17, 2021.

remain in full force and effect until the obligations under the Modified Note are satisfied in full."

¶ 13    The modified promissory note obligated the Purchasers, who were listed in the note by name and referred to collectively as the "Borrowers," to pay Ybarra $370,000, under the terms provided in the Amended SPA and was signed on behalf of the Purchasers by Masters, as the president of Monarch. The modified note further provided the following remedy for enforcement:

"In the event that this Note is placed by Lender in the hands of an attorney for collection or is collected by the institution of legal proceedings, or if an attorney is retained to represent Lender in any other proceeding whatsoever in connection with this Note, Borrower agrees to pay all costs and expenses of such proceeding including, but not limited to, reasonable attorney's fees."

¶ 14    In March 2017, plaintiffs filed their complaint against defendants Ybarra and Ruben Ybarra alleging four counts: breach of contract against Ybarra, misrepresentation against Ybarra and Ruben, accounting against Ybarra, and fraud against Ybarra and Ruben. Each of the counts in the complaint were premised on the allegation that since January 1, 2014, "innumerable monetary claims have been asserted, assessed and paid from or against Monarch," including Medicare withholding payments, Medicare payment plan payments, Department of Treasury payments, Medicare CAP payments, and other listed payments and bills. These setoffs represent monies owed from Ybarra as it related to the purchase price and the amount of the setoffs due to the Purchasers was "far in excess of the monies delineated in the Stock Purchase owing and due" Ybarra. Plaintiffs sought in excess of $750,000, plus interest at 5% per year since January 2, 2014, for each count in damages.

¶ 15    Plaintiffs filed an amended complaint on June 30, 2017, which was substantially similar to the initial complaint, except it added Gubin and Blisko as plaintiffs and attached signed copies of the SPA agreements and promissory notes.

¶ 16    In August 2017, Ybarra filed her answer to the amended complaint and filed her counterclaim against plaintiffs. She alleged one count of "action on a promissory note" based on the Purchasers' failure to pay the amounts due and owing under the amended promissory note, $370,000, plus interest and costs, which matured on May 31, 2016. Ybarra sought the principal balance, accrued interest, costs, and attorney fees.

¶ 17    By a May 2019 case management order, plaintiffs voluntarily withdrew the counts alleging fraud and misrepresentation from their amended complaint with prejudice. Thereafter, the trial court dismissed Ruben Ybarra from the action with prejudice following the withdrawal of the only claims plaintiffs alleged against him.

¶ 18    In October 2019, the parties proceeded to a bench trial on plaintiffs' breach of contract claim as well as Ybarra's counterclaim. Plaintiffs dismissed their accounting claim at the start of the trial. The following summarizes the relevant evidence presented at the trial.

¶ 19    Elly Latinik testified that he was currently employed as the general oversight manager of Xcel Med, which provides medical supplies and durable medical equipment to nursing homes, as well as several other health care companies. He was one of the owners of Monarch and was involved in the general oversight. Monarch was a hospice and provided care for terminally ill patients. It does not admit patients to a facility, but caregivers visit patients and their family wherever the patients reside.

¶ 20    Latinik admitted that he was not claiming that he was fraudulently induced into entering into the SPA and promissory notes, nor was he prevented from investigating Monarch. When he

began operating Monarch, the cash flow was not positive and approximately 50% of the patients were found not to qualify for hospice care. These patients were "inappropriate" for hospice care and were discharged. Latinik described a terminally ill patient as one who has six months or less to live. He added that a patient had to be terminally ill in order to qualify for hospice care.

¶ 21    The Purchasers executed a promissory note for $600,000 to finance the purchase. Pursuant to an amended agreement, a new promissory note was executed for $370,000, which replaced the original note. Latinik admitted that no payments were made to Ybarra on the $370,000 note because the Purchasers did not receive any reimbursements for any care provided by Monarch and for over a couple of years, "virtually no payments came in." He also admitted that the $100,000 payment due on or before December 31, 2015, pursuant to the Amended SPA was not paid. He explained that if Monarch owed Medicare, then when the explanation of benefits was received, the claim would be approved, but no money was received, and the amount was credited toward the balance due to Medicare.

¶ 22    Monarch was still in operation at the time of the trial and was operating profitably. It was "maybe slightly" profitable in 2017, but Latinik did not believe Monarch was profitable in 2016. None of the Purchasers had prior experience in palliative care and hospices but were in the health care industry. Latinik was not aware that plaintiffs did not produce any bank statements or a general ledger during discovery. He could provide no reason why Monarch's tax returns from 2013 to 2018 were not produced during discovery.

¶ 23    Martin Chochol[3] testified that he was from Poland and English was his second language. He was employed as the chief financial officer (CFO) for Xcel Medical and he also provided

---

[3] Martin Chochol's first name is also referred to as Marcin in the record.

bookkeeping for five other entities. He performed bookkeeping services for Monarch in 2015 and was still overseeing those services at the time of the trial. He was not involved with the financial affairs of Monarch in 2013 or 2014. He had never seen the SPA between the parties or the schedules to the agreement.

¶ 24    When he was the bookkeeper for Monarch, he handled the booking for accounts receivable, in-flows and out-flows, bank reconciliations, and prepared financial statements. As part of the accounts receivable, he would record any money that came in and reviewed all explanation of benefits (EOBs). The review of EOBs meant that Monarch was billing insurance, mostly Medicare, for services provided to patients. Then the insurance would pay Monarch for the services. The EOBs would detail the benefits and show what services the insurance would be paying for or what they were denying. The EOBs also disclosed when Medicare was withholding payment for an approved claim to pay debts owed to Medicare. Chochol referred to an Excel spreadsheet he created in September 2016 as a business record to see how much money had been withheld by Medicare. The spreadsheet was admitted as plaintiffs' exhibit number 4. He described the spreadsheet format.

> "The first column, it says Remit Date. This is the date that relates to the EOB. The second column is a payment. This is the amount that Medicare paid us, meaning that that money hit our bank account. The next column which is 2013, '14, '15 and '16 represents service dates. So what I did is I took every payment that came. I broke it down by service dates. Then the next column is withhold. I took each payment in that column, in the orange column, and I did exactly the same thing. Each payment that was withhold [*sic*] from us, I break it down by the service dates which are 2013, '14, '15 and '16. So we had money that came in the bank

account that are on the left, and I broke down by the service dates, and we have money that was approved to us but were withheld and are broken down by the service dates."

¶ 25    Chochol explained that Monarch would bill Medicare for services, but the payments were withheld from Monarch to pay for old claims from 2013 service dates. According to Chochol, Medicare withheld $260,082.61 from approved services in 2014 to pay for 2013 service dates. Medicare withheld $185,892.68 from 2015 service claims, as well as an additional $188,873.28 for a Medicare cap payment. Between January 2014 and August 2016, Medicare withheld $705,967.64. Chochol testified that the money withheld by Medicare in 2014 and 2015 was not due to improperly billed services during 2014 and 2015, but rather it "was denied because Medicare found some issues with 2013 service dates and they asked for the money back."

¶ 26    On cross-examination, Chochol was shown Schedule 2.14(a) from the SPA, admitted as Ybarra's exhibit number 17, which listed $325,471.53 for the total in accounts receivable as of December 4, 2013, but he testified that he did not know what service dates that figure represented. Chochol also testified about his spreadsheet from plaintiffs' exhibit number 4 which showed Monarch collected $239,462.70 for accounts receivable on services accrued prior to December 31, 2013.

¶ 27    Plaintiffs rested after Chochol's testimony. Ybarra moved for a directed finding, which the trial court granted. The court found that plaintiffs failed to establish full performance of the contract as well as the breach amount and damages. The court observed that plaintiffs' spreadsheet in an exhibit showed the remit dates, but it did not have dates of service. The court concluded that plaintiffs failed to "tie up" the monies withheld with dates of services rendered. The case then proceeded on Ybarra's counterclaim.

¶ 28    Melissa Haney testified that she was employed by Monarch as the clinical director from approximately April to October 2014. She explained that Medicare would sometimes withhold payments because there was not enough documentation submitted to establish that the patient qualified for hospice. She was aware that a cap existed per patient, but was not involved in the clawbacks for when a cap was exceeded.

¶ 29    Ybarra then provided the following testimony. She has been married to Ruben Ybarra since 2007. She first became aware of a business opportunity to purchase the Monarch stock in 2012. She was informed that there were issues at Monarch and the prior owners wanted to potentially sell. She thought it looked like a "good business opportunity" where she would have the ability to "kind of clean up some of the liabilities that were happening there, and ability to kind of turn around the business" and make it profitable. Ybarra was involved in real estate businesses, including investing in apartment buildings.

¶ 30    She purchased Monarch in 2012, but she did not plan on keeping the business as a long term asset. She was approached in August 2013 by the Purchasers about their interest in buying Monarch. By then, Ybarra had "cleaned up" many of the liabilities and had worked to make the business "look a lot better and be a lot better." When she purchased Monarch, the liabilities were close to $2.5 million. She believed the liabilities were approximately $800,000 when the Purchasers first looked at Monarch.

¶ 31    Ybarra recognized schedules attached to the SPA and testified that the schedules were accurate. She specifically recognized a document generated from Monarch's billing software which reflected $325,471.53 in accounts receivable as of December 4, 2013. Plaintiffs' counsel then objected to the relevance of these documents and Ybarra's counsel informed the trial court that he intended to seek leave to amend the counterclaim pleading to conform with the proofs.

¶ 32    As part of the sale, Ybarra received $50,000 from the Purchasers with an additional $100,000 paid a few months later. After the closing on the sale of Monarch to the Purchasers, Ybarra stayed on to help with the accounts receivable that were due to her as well as making sure that bills and staffing were paid. Ybarra never received any notice from the Purchasers for her to pay a sum of money prior to the filing of the lawsuit. Ybarra never received any payments on the $370,000 principal due under the promissory note. The parties stipulated that the promissory note was only signed by Masters.

¶ 33    Virginia Mozola testified that she was employed by Monarch as the vice president of operations beginning in 2006 until May 2014. She was involved in day-to-day operations including handling the accounts receivable and accounts payable. Monarch was "not in real good shape" when Ybarra first became involved. Monarch was being audited and some of the funds that were supposed to come in from Medicare on claims were being held to accommodate the cap. Monarch was also in debt over $2 million, which included payroll taxes and payments to vendors. Collection lawsuits had been filed against Monarch.

¶ 34    Mozola was familiar with Schedule 2.14(a) showing accounts receivable that was generated from the billing software. The schedule was a report that indicated what had been billed for the year. She generated the report and had no reason to believe it was inaccurate. The schedule was prepared on December 4, 2013, and reflected amounts as of November 30, 2013. The first column, indicated as balance, listed several figures and showed a total of $325,471.53. Mozola referred to the numbers as reflecting what Monarch would bill after reviewing a "pre-bill report." Mozola also identified a balance sheet for Monarch as of November 30, 2013, which she generated. It indicated that the total for accounts receivable as of that date was $263,013.40, which reflected a deduction of $62,458.13 from $325,471.53. Mozola testified that prior to her leaving Monarch,

the Purchasers did not pay any of the proceeds from the accounts receivable to Ybarra. However, she did not testify to what was received

¶ 35    Ruben Ybarra testified that he had worked in real estate and banking, and prior to Monarch, he was not involved in any health care related entities. The Ybarras were approached by an acquaintance in 2011 about the opportunity to invest or purchase a hospice company that was distressed. The company needed a capital injection and had the potential to be lucrative once it was stabilized. They arranged to meet with the principals at Monarch and engaged in due diligence regarding Monarch's financial and business affairs.

¶ 36    At the time his wife purchased the Monarch stock, Monarch's liabilities totaled approximately $2.3 million. Ybarra's role at Monarch was general oversight, she was supervisory while Mozola was the general manager who handled the accounts and checks. Ruben helped with the accounts payable to help prioritize vendors and also to negotiate vendor settlements.

¶ 37    When the Purchasers approached Ybarra to purchase the Monarch stock, they engaged in extensive due diligence, including bringing in their own specialists to review the accounts receivable. The Purchasers had access to all of the financials, including the billing software. Ruben's main contact with the sale was Latinik and he negotiated most of the sale for Ybarra. Ruben reviewed Schedule 2.14(a) and believed that the total for accounts receivable of $325,471.53 was accurate. It was generated by Mozola using the business's software. He believed they collected approximately $50,000 before leaving Monarch. He never received payment for any other receivables from Monarch. He also reviewed Schedule 2.14(b) which detailed the accounts payable and was also generated by Mozola.

¶ 38    Ruben explained that the sale of Monarch was "the culmination of a couple year's work." The goal was to buy the distressed company, use their knowledge and expertise to fix it, and then

sell it once it stabilized. They remained involved after the sale for about three months. The initial $150,000 received from the sale was used to pay outstanding payables that were Ybarra's responsibility under the SPA.

¶ 39   In January 2014, Monarch received the Palmetto letter regarding the hospice cap and seeking a clawback of $130,000. As a result, the parties created the Amended SPA because the clawback related to a time frame for which Ybarra would be responsible. The Amended SPA required an upfront payment of $100,000, with interest at 5% per annum, on or before December 31, 2015, and $370,000 payable on terms noted above. This $100,000 payment was never made by the Purchasers, and Ruben testified that Ybarra's testimony that it had been paid was incorrect. The Purchasers did not make any payment on the second promissory note amount of $370,000, plus interest.

¶ 40   Mary Sheehan testified that she was a nurse and worked as a consultant. She consulted with hospice programs about either their admission process, their quality process, or operations. Sheehan was retained as a consultant by Masters to provide an assessment of Monarch in 2013 when he was considering a purchase of the business. She made several site visits to prepare her assessment. She talked to staff and reviewed policies, patient charts, and financial statements. She was given access to the billing software by Mozola.

¶ 41   In her August 2013 assessment, Sheehan found that the records she reviewed were incomplete and the documentation would not meet the requirements such that many of the patients could be audited by Palmetto and the payment would be denied. She found that the conditions of participation that govern a hospice for Medicare were not being followed. She was concerned about Monarch being able to successfully bill Medicare. She believed there would be an upcoming

14

Medicare clawback. She did not recall if she gave a recommendation regarding the purchase, but she was critical of the business and let her report speak for itself.

¶ 42    Following Sheehan's testimony, Ybarra rested. Ybarra's attorney moved to conform the pleadings to the proofs presented at trial. The proposed amended counterclaim set forth two counts: breach of contract and action on a promissory note. The breach of contract count alleged that plaintiffs breached the Amended SPA by failing to pay (1) the stock purchase price as specified in the Amended SPA and promissory note, (2) the accrued interest, and (3) the accounts receivable. At the time of filing, the alleged amounts due and owing were: (1) $470,000 for the principal balance, (2) $117,500 in accrued interest, and (3) $325,471.53 in accounts receivable. The action on a promissory note alleged that the maturity date on the note had passed and plaintiffs failed to remit the sums as set forth in the amended promissory note. Ybarra sought the full amount with accrued interest, plus enforcement costs and attorney fees.

¶ 43    Plaintiffs' counsel objected to filing of the amended counterclaim as prejudicial. He argued that the breach of contract claim was "entirely different" from a breach of promissory note, and he was unable to prepare a defense for that claim. Following arguments, the trial court granted Ybarra's motion to file the amended counterclaim. The court also dismissed plaintiffs Blisko and Gubin from Ybarra's countersuit.

¶ 44    In its findings on the record, the trial court indicated that it did not find that Chochol was incredible. However, the court stated it was "not affording to [Chochol's spreadsheet admitted as plaintiffs' exhibit number 4] the weight I would of business records that clearly were created in the ordinary course of business; rather, it looked more like an accountant's take." The court found the spreadsheet appeared like "an Excel spreadsheet." The records did not have "the necessary backup" for the court to take into account that the clawbacks were appropriately reflected in the

documentation. The court further found Sheehan to be "quite credible." The court also discussed Mozola's testimony regarding the books and records and noted that Mozola had described Monarch's financials as "in shambles" and she was the person trying to keep track of "those not-so-great-shape financials."

¶ 45 The court concluded that the promissory note was valid and observed that the reduction of $130,000 for the clawback showed consideration. The court noted that Masters signed the note on behalf of Monarch, and based on this, the court found Monarch liable on the promissory note for $370,000, plus accrued interest.

¶ 46 Regarding the breach of contract count, the court reiterated its finding that Chochol's numbers were not credible. The court also concluded that the accounts receivable as testified to by Mozola was not credible either. The court found there was a breach of contract for $100,000, plus interest. The court also held that attorney fees were warranted under the agreement. The court further found that the $370,000 owed to Ybarra was collectible against all the Purchasers who signed the Amended SPA. The total award was $470,000, plus interest and attorney fees on the Amended SPA.

¶ 47 In a written order, dated October 7, 2019, the court ordered as follows: (1) judgment in favor of Ybarra and against plaintiffs for both the accounting and breach of contract counts from plaintiffs' amended complaint; (2) judgment entered in favor of Ybarra and against Latinik, Masters, and Miranda, jointly and severally, for breach of contract in the principal amount of $470,000, plus interest in the amount of $125,869.86, costs of $260.70, and attorney fees to be determined; and (3) judgment in favor of Ybarra and against Monarch on the breach of the promissory note, in the principal amount of $370,000, plus $99,089.04 in interest, $260.70 in costs, and attorney fees. The court further ordered that "the payment of the Monarch Judgment will

reduce dollar-for-dollar the [Purchasers] judgment. Likewise, the payment of the [Purchasers] judgment will reduce dollar-for-dollar the Monarch Judgment."

¶ 48    In November 2019, following a hearing on Ybarra's petition for attorney fees, the trial court awarded a total of $124,857.50 in attorney fees, jointly and severally against plaintiffs. The court also rejected plaintiffs' argument that there was no basis for attorney fees under the contracts. Following a hearing on February 27, 2020, the court denied plaintiffs' motion to reconsider allowing the amended counterclaim. The court also denied Ybarra's motion to reconsider the court's denial of an award for accounts receivable.

¶ 49    All parties have appealed. Ybarra filed her notice of appeal on March 18, 2020. Plaintiffs filed their notice of cross-appeal on March 20, 2020. All notices of appeal were filed in compliance with Illinois Supreme Court Rule 303 (eff. Jan. 1, 2015). Accordingly, this court has jurisdiction of this appeal under Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994).

¶ 50    For expediency, we first consider plaintiffs' cross-appeal, which raises multiple claims. Plaintiffs argue the trial court abused its discretion in allowing Ybarra to raise new claims in her amended counterclaim which was filed after the close of proofs. Specifically, plaintiffs contend that were not prepared to defend against the new breach of contract claim which differed from the original count of breach of a promissory note. Ybarra responds that the promissory note was not a freestanding, separate contract and was executed in the same transaction as the SPA and other documents, and her initial counterclaim was premised on plaintiffs' failure to pay pursuant to these documents.

¶ 51    Section 2-616(c) of the Code of Civil Procedure (the Code) provides: "A pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs, upon terms as to costs and continuance that may be just." 735 ILCS 5/2-616(c) (West 2018). The test is

17

" 'whether the allowance of the amendment furthers the ends of justice.' " *Benzakry v. Patel*, 2017 IL App (3d) 160162, ¶ 85 (quoting *American National Bank & Trust Co. of Chicago v. Dozoryst*, 256 Ill. App. 3d 674, 678 (1993)). " 'Any doubt as to whether pleadings should be amended should be resolved in favor of an amendment.' " *Id*. (quoting *American National Bank*, 256 Ill. App. 3d at 678).

¶ 52    Although plaintiffs did not include a proper standard of review for this issue (see Ill. S. Ct. R. 341(h)(3) (eff. Oct. 1, 2020)), it is well established that "[t]he circuit court retains broad discretion in allowing or denying amendment to pleadings prior to the entry of final judgment, and a reviewing court will not reverse the trial court's decision absent a manifest abuse of such discretion." *Richter v. Prairie Farms Dairy, Inc.*, 2016 IL 119518, ¶ 35. "An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Direct Auto Ins. Co. v. Bahena*, 2019 IL App (1st) 172918, ¶ 35.

¶ 53    Illinois courts recognize "the long-standing principle that instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction are regarded as one contract and will be construed together." *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007). In this case, the SPA and promissory note were executed as part of the same transaction with the same parties for the purchase of Monarch stock from Ybarra. The SPA, and the later Amended SPA, detailed the amount of the purchase price and the payments to be made, including the financing of a portion of the purchase price. The promissory note set forth the promise by the Purchasers to pay Ybarra under the terms in the contract. The Amended SPA and amended promissory note set forth that the Purchasers financed the reduced purchase price of $370,000, with 5% interest per annum, to be paid in May 2016. It is uncontested that this payment was not

made. The Purchasers also agreed to pay $100,000, with 5% interest per annum, in December 2015, which the trial court also found was unpaid.

¶ 54    In reviewing whether a trial court abused its discretion in allowing leave to amend, Illinois courts must determine whether "(1) the proposed amendment would cure the defective pleading; (2) the proposed amendment would surprise or prejudice the opposing party; (3) the proposed amendment was timely filed; and (4) the moving party had previous opportunities to amend." *Sheffler v. Commonwealth Edison Co.*, 2011 IL 110166, ¶ 69; see also *Loyola Academy v. S & S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992). Plaintiffs assert that all four factors weigh against allowing the amended counterclaim. These same contentions were presented to the trial court and were rejected.

¶ 55    Plaintiffs first assert that Ybarra was not curing a defect because she was suing the wrong parties on the breach of the promissory note. More specifically, they contend that the Purchasers were not parties to the note because Masters signed as president of Monarch. We disagree. Ybarra's initial counterclaim alleged that the Purchasers executed the amended promissory note but failed to pay. Significantly, the Purchasers, *i.e.* Masters, Latinik, and Miranda, were specifically named on the amended note as the "Borrowers." Even if Ybarra had named the wrong parties in the breach of the promissory note, she cured this potential defect with the breach of contract claim. By adding the breach of contract claim based on the same allegations that the Purchasers failed to pay Ybarra under the contract and note, she corrected any defect related to the signatory of the note. This factor weighs in favor of allowing the amendment.

¶ 56    Second, plaintiffs argue that they were prejudiced and surprised by the breach of contract claim because it required them to defend against different claims. We again disagree and conclude there was no prejudice or surprise because the breach of contract claim alleged the same failure to

pay as set forth in the promissory note. Both claims relate to documents executed as part of one transaction for the sale of Monarch. "[I]n order to allow the amendment of a pleading to conform to proof, the proof already produced must support the amendment." *Harding v. Amsted Industries, Inc.*, 276 Ill. App. 3d 483, 494 (1995). Here, Ybarra's counsel indicated that he intended to file a motion to amend the counterclaim to conform to the proofs during Ybarra's testimony and presented evidence to support the claim. In denying plaintiffs' motion to reconsider, the trial court explained that it allowed the amended counterclaim because it was looking at a "a totality of documents." Further, plaintiffs alleged a breach of the same contract at trial, and while unsuccessful, they were fully aware of the terms and obligations due under the Amended SPA. Plaintiffs, through Latinik's testimony, admitted that they did not fulfill their payment obligations under the contract. This factor also weighs in favor of allowing the amendment.

¶ 57    Third, plaintiffs contend that the amendment was not timely because the trial court previously denied Ybarra's motion for summary judgment on the counterclaim and Ybarra's counsel had not raised a claim on the Amended SPA during the litigation. Plaintiffs offer no further discussion as to how the amended counterclaim was untimely, nor do they address section 2-616(c) which expressly allows an amendment to conform the pleadings to the proof. Plaintiffs' failure to discuss this section is fatal to their argument. Since the amendment was permitted under the Code, we find no abuse of discretion on this ground.

¶ 58    Fourth, plaintiffs assert that Ybarra had previous opportunities to amend the pleading. Plaintiffs rely on a discussion between the trial court and Ybarra's counsel in which counsel admitted that he had drafted both the Amended SPA and promissory note and none of the additional evidence presented at trial was necessary to file the breach of contract claim. However, after the conclusion of the discussion, the court granted the motion to file the amended

counterclaim. Moreover, the court's primary concern related to Gubin and Blisko, but Ybarra agreed to dismiss them from the counterclaim when the court granted the motion for leave to amend. The trial court considered the argument raised by plaintiffs and rejected it. Plaintiffs again fail to discuss how the trial court abused its discretion in granting the motion, setting forth only a bare conclusion that the trial court erred in allowing the amended counterclaim. Absent any argument, we find this factor also weighs in favor of amending the counterclaim.

¶ 59    As discussed above, the trial court had the opportunity to consider and reject plaintiffs' arguments at both the hearing on the motion for leave to amend and the motion to reconsider. In allowing the amended counterclaim, the trial court specifically found that under the Amended SPA, the modified promissory note required the Purchasers and Monarch to sign off on the promissory note. The court observed that it was "looking at a totality of documents." Plaintiffs have not argued that the court's decision to allow the posttrial amended counterclaim was arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. The trial court acted within its discretion to allow the amended counterclaim.

¶ 60    Next, plaintiffs contend that the trial court erred in entering judgment against Monarch. Specifically, plaintiffs argue that no claims existed against Monarch prior to trial and there was no evidence that Monarch executed the promissory note. Once again in violation of Supreme Court Rules, plaintiffs fail to set forth the standard of review. See Ill. S. Ct. R. 341(h)(3). According to plaintiffs, Monarch was a nominal party and lacked notice that it was subject to any liability and no evidence was introduced at trial that Monarch executed the promissory note.

¶ 61    Here, plaintiffs cite a single case, *Nye v. Parkway Bank & Trust Co.*, 114 Ill. App. 3d 272, 274 (1983), for the general proposition that procedural due process and equal protection require a person to be given notice, an opportunity to be heard, and to defend against a claim in an orderly

proceeding. In *Nye*, an attorney filed a complaint seeking his unpaid attorney fees from a client. The trial court entered judgment in favor of the attorney before the attorney had rested his case and before the defendant had been afforded the opportunity to present his case. *Id*. at 272-73. On appeal, the defendant argued that the trial court had deprived him of his due process rights when it entered judgment before he was able to present a defense. *Id*. at 273. The reviewing court concluded that the "defendant was deprived of the protection of his day in court when he was not given the opportunity to be heard in his defense, a basic principle provided for by our constitutional mandates and consistent with the fundamental concept of an equitable judicial system." *Id*. at 276. *Nye* does not assist because Monarch was a party to the lawsuit from its inception and was represented by counsel throughout the proceedings.

¶ 62    In the amended complaint, Monarch is described as: "an Illinois corporation, owned by [Ybarra] and sold to the individual Plaintiffs, via a Stock Purchase Agreement and the individual purchasers became shareholders of the MONARCH entity, subsequent to the stock purchase." Plaintiffs alleged that "pursuant to the Stock Purchase, the individual Plaintiffs via MONARCH, paid [Ybarra] the additional sum of $50,000.00." All of the counts alleged in the complaint were on behalf of all plaintiffs, including Monarch, with relief demanded on behalf of all plaintiffs. On the breach of contract count upon which plaintiffs proceeded to trial, they alleged that Monarch "has made substantial payments to attorneys, accountants, business brokers, totaling sum in excess of $99,640.73, to date and have additionally incurred substantial other liabilities ***." It is clear from the record that Monarch was not merely a nominal party.

¶ 63    Moreover, the initial counterclaim alleged that the "Borrowers," referring to the Purchasers, failed to pay the principal balance of the promissory note and asked the court for a judgment order of the principal balance plus interest. The counterclaim specifically alleged that

22

the "defendants," referring to plaintiffs, were required under the Amended SPA to provide Ybarra with written notice for any reduction in the note. Ybarra further alleged that no written notice "was provided by the Defendants before the Maturity Date" and that "Defendants have waived any reduction in principal that may be due and owing to them." The language of the counterclaim specifically designated between the Borrowers, *i.e.*, Latinik, Masters, and Miranda, and the collective Defendants, which included Monarch. Thus, the counterclaim included allegations against Monarch, as well as the Purchasers, and their claim to the contrary fails.

¶ 64    Plaintiffs also contend that there was no evidence that Monarch executed the promissory note. This argument is somewhat counter to their position taken at trial. During the trial, plaintiffs argued that the Purchasers could not be held responsible for the obligations of the amended promissory note because it was only signed by Masters, as president of Monarch. Based on plaintiffs' assertion that the individual Purchasers did not sign the amended note, the court entered judgment against Monarch. At the time the amended note was executed, the transfer of the Monarch stock from Ybarra to the Purchasers had already occurred. As discussed above, the SPA and note were amended to reflect a reduction in the purchase price to offset the Medicare clawbacks for services rendered while Ybarra owned Monarch. While plaintiffs contend there was no proof that Masters was president of Monarch, it is clear that ownership of Monarch had transferred to the Purchasers, and they were responsible for the debts owed by the entity. Their argument to the contrary is a disingenuous attempt to avoid liability that they owed the purchase price to Ybarra. Monarch was a named and active party owned by the Purchasers, who executed the Amended SPA and amended note to their benefit of a reduction in the purchase price. We reject these claims to the contrary.

¶ 65    Plaintiffs next raise the following issues related the judgment against the Purchasers: (1)

23

there was no breach of the Amended SPA; (2) Ybarra's right to payment for the Monarch stock was limited to the amended note; (3) the trial court erred in allowing Ybarra to present irrelevant evidence; and (4) the trial court erred in awarding attorney fees absent a provision for fees in the Amended SPA.

¶ 66    First, plaintiffs argue that there was no breach of the Amended SPA because the purchasers' obligations "consisted solely of delivering the Modified Note," which they performed. However, in their brief argument, plaintiffs fail to cite any relevant authority, nor do they set forth the requisite standard of review. Supreme Court Rule 341(h)(7) requires an appellant to include in its brief an "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Mere contentions, without argument or citation to authority, do not merit consideration on appeal. *Palm v. 2800 Lake Shore Drive Condominium Association,* 401 Ill. App. 3d 868, 881 (2010). The rule is consistent with the principle that "[a] reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented ***, and it is not a repository into which an appellant may foist the burden of argument and research." *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993). The above cited procedural rules concerning the content and format of appellate briefs are mandatory. *Voris v. Voris*, 2011 IL App (1st) 103814, ¶ 8.

¶ 67    It is not this court's role to create an appellate argument, research the issue, and then apply the relevant authority to the facts in order to determine whether the claims have merit. Undertaking these tasks would not only shift plaintiffs' burden to this court, but also deprive Ybarra of a meaningful opportunity to respond to the theory. For these reasons, plaintiffs' claim falls well short of the Rule 341 and has been forfeited.

¶ 68    Forfeiture aside, we find no merit in plaintiffs' contention that purchasers' obligations under the contract "consisted solely of delivering the Modified Note," which they performed. First, plaintiffs fail to argue that the trial court's finding was against the manifest weight of the evidence. And as noted above, they fail to cite the appropriate standard of review. Plaintiffs offer a citation to the report of proceedings as evidence that they performed the obligation of delivering the modified note. Specifically, plaintiffs cite to the following four lines from Ruben's direct examination.

> "thing.
>
> He kept saying he signed it. And I'm like,
>
> no, Elly -- or, Steve, you didn't.
>
> He goes, Well, I signed it for Monarch."

However, these statements from Ruben's testimony fail to support this contention.

¶ 69    Moreover, plaintiffs' assertion is absurd that the Amended SPA only required delivery of the note, but did not obligate them to pay the agreed purchase price. The Amended SPA clearly belies plaintiffs' contention. As noted above, the Amended SPA made amendments to specific portions of the SPA and ratified and approved the SPA in all other respects. Section 1.2(e)(ii) with the relevant amendments from the Amended SPA provides, in relevant part:

> "(e)    The balance of the Purchase Price, [$370,000,] shall be paid to Seller by Purchaser as follows ('Financed Portion') as set forth in a Promissory Note (the 'Note'), dated as of Closing, a copy of which is attached hereto and made a part hereof as Schedule 1.2(e):
>
> ***
>
> ii.    Three Hundred Seventy Thousand Dollars ($370,000) on or

before the two (2) year anniversary after the Delivery Date. All amounts payable under the Modified Note will accrue interest at five percent (5%) per annum. Purchaser agrees to pledge to Seller the Shares as collateral to secure timely payment of all sums due under the Modified Note pursuant to the terms of the existing Pledge Agreements attached hereto as Schedule 1.2(d)."

¶ 70    This provision specifically detailed the amount due to Ybarra from the Purchasers, when the payment was due, and the amount of interest to accrue. Thus, purchasers' argument that no breach occurred when they admittedly failed to pay the purchase price by the due date listed in Amended SPA is without merit.

¶ 71    Plaintiffs' next contention consists of four sentences without a single citation to any authority, a standard of review, or the record. Again, this argument fails to comply with Supreme Court Rule 341(h)(7), which requires an appellant to include in its brief an "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Mere contentions, without argument or citation to authority, do not merit consideration on appeal. *Palm*, 401 Ill. App. 3d at 881. As already noted above, the rule is consistent with the principle that "[a] reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented ***, and it is not a repository into which an appellant may foist the burden of argument and research." *Obert*, 253 Ill. App. 3d at 682. The above cited procedural rules concerning the content and format of appellate briefs are mandatory. *Voris*, 2011 IL App (1st) 103814, ¶ 8.

¶ 72    However, forfeiture aside, plaintiffs' argument lacks merit. While plaintiffs contend in

their subheading that Ybarra's right to payment for her stock was limited to the modified note, the brief argument merely restates that same assertion as the previously rejected argument, *i.e.*, the Amended SPA only required the Purchasers to execute and deliver the modified note and Ybarra lacks any recourse under the Amended SPA. We have already considered and rejected this argument above. Thus, this contention fails as well.

¶ 73 Next, plaintiffs argue in a single paragraph that it was "unjust" for the trial court to allow "Ybarra to adduce proofs at trial for an unfiled claim for the sole purpose of allowing Ybarra to 'conform the pleading to the proofs.' " Again, plaintiffs failed to cite any authority, a standard of review, or any page in the record on appeal. Thus, this argument fails to comply with Supreme Court Rule 341(h)(7) (Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020)) and the well-established precedent discussed above.

¶ 74 Forfeiture aside, plaintiffs' contention fails because it is merely a restyling of its prior argument that the trial court erred in allowing Ybarra to file an amended counterclaim. In their brief argument, plaintiffs assert that they were denied their right to respond or plead to an amended counterclaim before the trial court entered judgment on that claim. This is essentially the same argument we considered and rejected above that the trial court abused its discretion in allowing Ybarra to file the amended counterclaim. Since we already considered the claim, we need not address it again here.

¶ 75 Finally, plaintiffs argue that the trial court erred in awarding attorney fees for breach of contract because the Amended SPA does not contain a provision for the award of fees. Once again, plaintiffs failed to cite any authority or a standard of review in their short four-sentence argument. Accordingly, this argument also fails to comply with Supreme Court Rule 341(h)(7) (Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020)) and the well-established precedent discussed above

¶ 76    Although this argument is clearly forfeited, but we choose to address it and consider whether the award of attorney fees for the breach of the Amended SPA was proper. Illinois follows the American Rule under which a party is responsible for his own attorney fees. *Geisler v. Everest National Insurance Co.*, 2012 IL App (1st) 103834, ¶ 86. The American Rule "prohibits prevailing parties from recovering their attorney fees from the losing party, absent express statutory or contractual provisions." *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 64.

¶ 77    Section 9.9 of the SPA, which was incorporated into the Amended SPA, states:

> "Damages/Remedies. Should any party default pursuant to its obligations contained herein, the opposing party shall have available all rights at law and/or at equity to remedy said default. The defaulting party shall be liable for actual and all consequential damages. The non-defaulting party shall have the right to setoff any amounts owed to the defaulting party. The parties acknowledge that Purchaser is explicitly not responsible for the obligations of the Company contained herein or otherwise."

¶ 78    This damages provision does not expressly provide for the award of attorney fees for any default under the contract. Thus, under the American Rule, Ybarra was not entitled to an award of attorney fees for the breach of contract claim.

¶ 79    However, we point out that the enforcement provision for the modified note provides: "Borrower [referring to Purchasers] agrees to pay all costs and expenses of such proceeding including, but not limited to, reasonable attorney's fees." Further, the escrow agreements executed by the Purchasers stated:

> "In case of a breach, the parties shall have all cumulative remedies at law and equity. The parties prevailing in litigation shall be entitled to their reasonable

attorneys' fees."

¶ 80 Since the modified note provided for an award of attorney fees, Ybarra was entitled to attorney fees related to her claim on the note. Therefore, we vacate the award of attorney fees related to the breach of contract claim, but affirm the portion of attorney fees awarded related to Ybarra's claim for the breach of the modified note. We remand to the trial court to modify the award of attorney fees consistent with these findings.

¶ 81 Having resolved plaintiffs' claims regarding the amended counterclaim, we turn to Ybarra's claim on appeal that the trial court's decision denying damages for the accounts receivable was against the manifest weight of the evidence. Specifically, Ybarra argues that the trial court disregarded a proven element of damages, the accounts receivable from the period when she owned Monarch. Ybarra contends that the amount of these damages was "undisputed" and the trial court's failure to award this amount was against the manifest weight of the evidence.

¶ 82 "The basic theory of damages in a breach of contract action requires that a plaintiff 'establish an actual loss or measurable damages resulting from the breach in order to recover.' " *In re Illinois Bell Tel. Link-Up II*, 2013 IL App (1st) 113349, ¶ 19 (quoting *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 149 (2005)). The proper measure of damages for a breach of contract is the amount of money necessary to place the plaintiff in a position as if the contract had been performed. *Id*. Damages are an essential element of a breach of contract action and a claimant's failure to prove damages entitles the defendant to judgment as a matter of law. *Id*. In proving damages, the burden is on the plaintiff to establish a reasonable basis for computing damages. *Razor v. Hyundai Motor America,* 222 Ill. 2d 75, 107 (2006). Basic contract theory requires that damages be proved with reasonable certainty and precludes damages based on conjecture or speculation. *Id*. at 106-07.

¶ 83    "Where an award of damages is made after a bench trial, the standard of review is whether the trial court's judgment is against the manifest weight of the evidence." *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 13. "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002). "[I]n overturning a damage award, a reviewing court must find that the trial judge either ignored the evidence or that its measure of damages was erroneous as a matter of law." *1472 N. Milwaukee*, 2013 IL App (1st) 121191, ¶ 13. Therefore, an award of damages is not against the manifest weight or manifestly erroneous if there is an adequate basis in the record to support the trial court's determination of damages. *Id.*

¶ 84    Here, the Amended SPA provided in section 1.2(e)(iii) that the Purchasers, in addition to the purchase price, "shall pay to [Ybarra] all accounts receivable of [Monarch] which relate to the period prior to Closing (the 'Old A/R') on the 15th and 30th of every month." Ybarra alleged in her amended counterclaim that she never received any payments for the accounts receivable from the period prior to the sale of Monarch.

¶ 85    Ybarra argues that the trial court disregarded Chochol's uncontradicted testimony that plaintiffs collected $239,462.70 for the accounts receivable accrued for services while Ybarra owned Monarch. Specifically, Ybarra points to the following colloquy from Chochol's cross-examination.

> "Q. Okay. Now, you testified that you were in charge of accounts receivable or bookkeeping or accounting for accounts receivable. Wasn't that your testimony?
>
> A. Yes, I was doing bookkeeping.
>
> Q. Yeah. And you did that since 2015; correct?

A. Correct.

Q. Okay. So how much of the old Monarch receivables were collected by Monarch that accrued prior to December 31, 2013? Can you tell us that, please.

A. About 230 something thousand. It's on my spreadsheet.

Q. You collected 230,000 of the old Monarch receivables; correct?

A. Yes. That was -- yes.

Q. Okay. Maybe you can show me where on your spreadsheet that is. I've got a color coded one somewhere. Oh, here it is.

***

A. All of these are 2013 services that came [to] our bank account between January 2014 and this date, so it's $239,462.70."

¶ 86    Chochol referred to his spreadsheet, admitted as plaintiffs' exhibit number 4 at trial, to obtain this figure. As discussed in Chochol's testimony, the spreadsheet lists 11 column headings across: the first states "Remit Date", the second "Payment," the next four state the years 2013, 2014, 2015, and 2016, respectively, the seventh column states "Withholds," and the remaining four again list the years 2013 to 2016. Under the Remit Date column, numerous dates are listed starting at "1/1/2014" with the last date as "9/9/2016." The Payment and Withhold columns list varying dollar amounts that together correspond to all of the dates listed in the first column. For the individual year columns, either all or a portion of a payment or withhold amount is listed under a year. The bottom of the spreadsheet totaled all columns. Chochol's testimony referred to the 2013 column following the Payment column that indicated a total of $239,462.70. In his testimony, Chochol testified that Medicare withheld $705,967.64, and that the withholding totals for 2014 and 2015 were for 2013 service dates. The spreadsheet does not disclose the service dates related

31

to the corresponding money paid or withheld.

¶ 87    During her testimony, Mozola discussed Schedule 2.14(a) to the Amended SPA, which was a schedule of the accounts receivable. She stated that the report was generated from the billing software. The schedule was prepared on December 4, 2013, and reflected the amounts as of November 30, 2013. The first column, indicated as balance, listed several figures and showed a total of $325,471.53. It does not indicate what the balance reflects. Mozola referred to the numbers as what Monarch would bill after reviewing a "pre-bill report." Additionally, Mozola identified a balance sheet, admitted as Ybarra's exhibit number 21, for Monarch as of November 30, 2013, which she generated. She testified that according to the balance sheet, the total for accounts receivable as of that date was $263,013.40, which reflected a deduction of $62,458.13 from $325,471.53. Mozola left her employment at Monarch in May 2014.

¶ 88    Although the court did not find Chochol incredible, the court concluded it would not afford Chochol's spreadsheet "the weight [it] would of business records that clearly were created in the ordinary course of business; rather, it looked more like an accountant's take." The records did not have "the necessary backup" for the court to take into account that the clawbacks were appropriately reflected in the documentation. In granting the directed finding on plaintiffs' breach of contract claim, the court had observed that Chochol's spreadsheet failed to include the dates of services to "tie up" the monies remitted to Medicare. The court referred to this prior observation during its findings at the end of the trial. The court also concluded that Mozola's testimony was not credible regarding the accounts receivable.

¶ 89    The crux of Ybarra's argument is that the testimony from Chochol and Mozola based on their respective spreadsheets was not refuted by plaintiffs, and therefore, the trial court committed manifest error in rejecting Ybarra's request for the accounts receivable damages. According to

Ybarra, the trial court could not disregard the testimony of Chochol and Mozola and there were no credibility findings to be made. We reject this argument for a number of reasons. First, in " 'Illinois, the law is well established that the trial judge, sitting without a jury, has the obligation of weighing the evidence and making findings of fact.' " *Dobbs v. Wiggins*, 401 Ill. App. 3d 367, 375 (2010) (quoting *Chicago Investment Corp. v. Dolins,* 107 Ill. 2d 120, 124 (1985)). The trial court, as the factfinder, "is free to accept some evidence and reject others, as well as to determine the credibility of the witnesses and weigh their testimony." *Barth v. State Farm Fire & Cas. Co.*, 228 Ill. 2d 163, 180 (2008).

¶ 90 Next, we find the cases relied on by Ybarra to be distinguishable. In *Pancoe v. Singh*, 376 Ill. App. 3d 900 (2007), the plaintiff sued the defendant for the breach of an agreement related to a joint venture. At the bench trial, the defendant's expert witness had testified about his damages analysis, which showed that "the amount remaining to be split between plaintiff and defendant (under the dissolution agreement) totaled $54,847. [The expert] testified that, based on this $54,847 figure, plaintiff's 50% share would be $27,424." *Id*. at 906. The plaintiff also called [the expert] during his case and he testified about the financial statements prepared for the joint venture, including the profitability of the projects under contract when the dissolution agreement was signed. According to the expert, "these jobs, whose future earnings were projected at about $22,000, actually ended up losing more than $152,000." *Id*. at 905.

¶ 91 In reaching the damages award, the trial court adopted most of the expert's figures, but rejected his testimony that the projects lost over $150,000 and found this figure was not " 'a proper amount.' " *Id*. at 907. "The court therefore 'added [$152,310] onto the figures that [the expert] testified to[, made] an adjustment for a ten percent retention,' and divided the total amount in half, concluding that the correct figure for plaintiff's damages was $92,959." *Id*.

33

¶ 92    The defendant raised multiple issues on appeal, including a claim that the trial court's damages award was not supported by the evidence. *Id*. at 901-02. The defendant argued that there was no evidentiary basis for the trial court's rejection of the $152,310 loss figure, and if damages are to be awarded to the plaintiff, then the amount should be reduced to $27,424. *Id*. at 916. The reviewing court agreed with defendant and found that its review of the record had "revealed no such other evidence that would contradict this [$152,310] figure." *Id*. at 917. The court concluded that the trial court's rejection of the loss figure was against the manifest weight of the evidence and modified the damages award to $27,424. *Id*. at 917.

¶ 93    In *Bucktown Partners v. Johnson*, 119 Ill. App. 3d 346 (1983), a forcible entry and detainer action was brought by the landlord against the defendant tenant for nonpayment of rent. *Id.* at 347. After a garnishment proceeding was initiated to collect the money owed, the defendant moved to quash garnishment because the funds in her account were public assistance payments that were exempt from garnishment. *Id.* At the hearing on the motion, the defendant testified that public assistance payments were the sole source of the funds in her bank account. *Id.* No other witnesses testified at the hearing, and no other evidence was presented by the plaintiff as to the source of the defendant's funds. *Id.* at 347-48. Despite this, the trial court denied the defendant's motion to quash garnishment. *Id.* at 348. On appeal, the reviewing court reversed, stating that the "the unimpeached and uncontradicted testimony of a witness cannot be arbitrarily disregarded by a finder of fact" absent certain exceptions, such as where the testimony of the witness is inherently improbable. *Id.* at 353.

¶ 94    The facts of this case differ from both *Pancoe* and *Bucktown Partners*. In *Pancoe*, the trial court not only rejected the figure of related to loss on projects, but it also awarded damages unsupported by the record and based solely on the court's belief. In *Bucktown Partners*, the tenant

was not proving damages, but testified as to the source of her income from public assistance, which the trial court rejected without any support in the record.

¶ 95    In contrast with those cases, the circumstances of the present case relate solely to whether the evidence supported the damages sought by Ybarra. Ybarra was required to prove the damages she suffered in the breach of contract, including the amount of the accounts receivable. The trial court concluded that she failed to prove the total of the accounts receivable paid after she sold Monarch. The trial court's findings fully comport with section 1.2(e)(iii) of the Amended SPA, which provided that the parties "shall agree on a method to calculate whether: (1) the relevant accounts receivable exceeded the relevant accounts payable, with any excess amount then paid to Seller; or (2) the relevant accounts payable exceeded the relevant accounts receivable, with the amount of any deficiency deducted from the balance of the Note." Ybarra failed to present any evidence that the accounts receivable for 2013 service dates exceeded the relevant accounts payable as required under the contract. She relies on Chochol's spreadsheet for the figure of the total for accounts receivable, but offers no discussion regarding the figures and testimony related to the withholds, which exceed the accounts receivable.

¶ 96    We also point out that Chochol was not employed as a bookkeeper for Monarch until 2015, more than a year after the sale to the Purchasers. His spreadsheet, which was not prepared using business software, listed dates and payments that preceded his employment. It does not detail the source of the payments, what service date was being paid, or the date the spreadsheet was prepared. It only lists a date, an amount under payment, and an amount under a respective year. All but three of the entries under the 2013 column predated Chochol's employment at Monarch. Additionally, Mozola's exhibits predated the sale and set forth the amount due for accounts receivable. Neither the balance sheet, nor the schedule show payments made on those accounts after the sale. All three

exhibits show differing figures. Chochol's spreadsheet purports to show $239,462.70 received for 2013, while Schedule 2.14(a) lists a balance of $325,471.53, and Mozola's balance sheet shows $263,013.40 as the total due in accounts receivable as of November 30, 2013. Additionally, Ruben testified that Ybarra had received approximately $50,000 from the listed $325,471.53 in accounts receivable prior to leaving Monarch in 2014. The remaining balance, approximately $275,471.53, constituted a fourth calculation of the amount due for accounts receivable. He was unfamiliar with Chochol's figure of $239,462.70.

¶ 97    Unlike *Pancoe* and *Bucktown Partners*, the trial court did not disregard testimony, but rather the court found the limited evidence presented lacked the foundation to establish the damages claimed by Ybarra. Ybarra's claim for damages relied on Chochol's spreadsheet, which the trial court concluded lacked sufficient foundation to support the amount of damages. The basic rules of evidence require that a proper foundation be laid for the introduction of a document into evidence. *JPMorgan Chase Bank, N.A. v. E.-W. Logistics, L.L.C.*, 2014 IL App (1st) 121111, ¶ 92. Under Illinois Supreme Court Rule 236, the business records exception to the hearsay rule permits the admission of any business records of "any act, transaction, occurrence, or event" if those records are made: (1) in the regular course of business; and (2) at the time or within a reasonable time of the transaction. Ill. S. Ct. R. 236(a) (eff. Aug.1, 1992); *US Bank, National Association v. Avdic,* 2014 IL App (1st) 121759, ¶ 23. The rule further states that "[a]ll other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but shall not affect its admissibility." Ill. S .Ct. R. 236(a) (eff. Aug.1, 1992).

¶ 98    While the trial court admitted Chochol's spreadsheet under the business records exception during trial, the court afforded little weight to this exhibit when considering the amount of the

accounts receivable for 2013 service dates. As noted above, the trial court observed that it was not affording Chochol's spreadsheet "the weight [it] would of business records that clearly were created in the ordinary course of business; rather, it looked more like an accountant's take." The court further found that the records did not have "the necessary backup" for it to take into account that the clawbacks were appropriately reflected in the documentation. As discussed, the spreadsheet was prepared by Chochol as a summary of payments and withholdings for Monarch from January 2014 to September 2016. The spreadsheet listed figures, but did not include the service dates or details related to the payments or withholdings. "The trial court may admit summary exhibits into evidence if the court cannot conveniently examine the voluminous documents summarized to extract the fact at issue." *In re Estate of Burren*, 2013 IL App (1st) 120996, ¶ 32; see also *Veco Corp. v. Babcock*, 243 Ill. App. 3d 153, 166 (1993). "The party presenting the summary must make all summarized documents available in court or to the opposing party, 'to give the opposing party an opportunity to verify the reliability and accuracy of the summary prior to trial.' " *Id*. (quoting *Paddack v. Dave Christensen, Inc.,* 745 F.2d 1254, 1261 (9th Cir.1984)). In its findings, the trial court concluded that the spreadsheet was a summary that was not prepared in the normal course of business. The trial court did not find sufficient support for Chochol's spreadsheet in the other exhibits presented at trial.

¶ 99    As the trial court observed, none of the records provided any supporting documentation to reflect the Medicare clawbacks from the Palmetto audit in 2014 or the service dates. Even if we considered Chochol's spreadsheet, Ybarra has not addressed Chochol's testimony about the significant amounts withheld due to errors arising from 2013 service dates. Additionally, the court found Sheehan to be very credible. In her testimony, she stated that Monarch was not following the conditions of participation that govern a hospice for Medicare and was concerned about

Monarch being able to successfully bill Medicare and that there would be an upcoming Medicare clawback. The trial court heard the testimony and reviewed the evidence before concluding that the evidence did not support Ybarra's claim for damages. Based on our review of the record, we cannot say that the trial court's finding regarding the damages for accounts receivable was against the manifest weight of the evidence. We do not find that the opposite conclusion was apparent, nor were the court's findings unreasonable, arbitrary, or not based on the evidence.

¶ 100    Based on the foregoing reasons, we vacate the award of attorney fees related to the breach of contract claim and affirm the decision of the circuit court of Cook County for all other claims. We remand to the trial court to modify the award of attorney fees as directed in this decision.

¶ 101    Affirmed in part, vacated in part. Remanded with directions.